**Lansing, Michigan**

# Opinion

Chief Justice:
Marilyn Kelly

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman
Diane M. Hathaway

FILED AUGUST 23, 2010

S T A T E   O F   M I C H I G A N

SUPREME COURT

NICOLE SHAY, Personal Representative of
the ESTATE of THOMAS JOHN SHAY,
Deceased,

        Plaintiff-Appellant,

v

No. 138908

JOHN ALDRICH, WILLIAM PLEMONS,
and JOSEPH MILLER,

        Defendants-Appellees,
and

WAYNE ALLBRIGHT and KEVIN
LOCKLEAR,

        Defendants.

---

BEFORE THE ENTIRE BENCH

WEAVER, J.

In this case, we decide whether the Michigan Court of Appeals case, *Romska v Opper*, 234 Mich App 512; 594 NW2d 853 (1999), was correctly decided. After examination of the *Romska* decision regarding the scope of a release from liability, we

overrule *Romska* to the extent that its holding precludes the use of parol evidence when an unnamed party asserts third-party-beneficiary rights based on broad language included in a release from liability and an ambiguity exists with respect to the intended scope of that release. Accordingly, pursuant to MCR 7.302(H)(1), in lieu of granting leave to appeal, we reverse the judgment of the Court of Appeals, which heavily relied on *Romska*, and remand this case to the trial court for further proceedings.

## I. FACTS AND PROCEDURAL BACKROUND

Plaintiff, Thomas Shay,[1] alleged that he was assaulted by Melvindale and Allen Park police officers. On the day of the alleged assault, Officers John Aldrich and William Plemons of the Melvindale Police Department visited plaintiff at his home in response to a car alarm. After speaking with plaintiff, Officers Aldrich and Plemons left the home. They returned later that day, accompanied by Officer Joseph Miller of the Melvindale Police Department. In addition to the Melvindale police officers, two officers from the Allen Park Police Department, Wayne Allbright (or Albright) and Kevin Locklear, were present. Plaintiff alleged that Officer Aldrich struck him and he fell to the ground. Plaintiff further alleged that other officers present assaulted him after he fell.

Plaintiff filed suit, naming five defendants: Officers Aldrich, Plemons, and Miller ("the Melvindale Officers"), as well as Officers Allbright and Locklear ("the Allen Park

---

[1] Thomas Shay died approximately four months after oral argument on his application for leave to appeal in this Court, and Nicole Shay, the personal representative of his estate, was substituted as plaintiff. References to "plaintiff" in this opinion are to Thomas Shay.

2

Officers"). With respect to the Melvindale Officers, plaintiff alleged that they committed an assault and battery. As for the Allen Park Officers, plaintiff alleged that their inaction during the alleged assault amounted to gross negligence.

The Melvindale and Allen Park Officers, and their respective municipalities, were covered by different insurance companies and different insurance polices. Additionally, the Melvindale and Allen Park Officers, and their respective municipalities, were represented by separate defense counsel. Plaintiff, the Melvindale Officers, and the Allen Park Officers agreed to appear for a case-evaluation hearing. After the hearing, the following awards, based on each defendant's respective liability, were issued: $500,000 against Melvindale Officer Aldrich, $500,000 against Melvindale Officer Plemons, $450,000 against Melvindale Officer Miller, $12,500 against Allen Park Officer Allbright, and $12,500 against Allen Park Officer Locklear.

Plaintiff accepted the case-evaluation awards against the Allen Park Officers, and both Allen Park Officers agreed to the awards. Plaintiff additionally accepted the case-evaluation award against Melvindale Officer Miller, but rejected the case-evaluation awards against Melvindale Officers Aldrich and Plemons. All three of the Melvindale Officers rejected the case-evaluation awards. Accordingly, the Allen Park Officers were dismissed from the case, while a trial date was set for the remaining defendants, the three Melvindale Officers.

Plaintiff executed two releases, one naming Allen Park Officer Allbright and one naming Allen Park Officer Locklear. The two releases were identical in all respects

3

except for the named Allen Park Officer indicated in the document. The release naming Officer Locklear read in part as follows:

> For the sole consideration of TWELVE THOUSAND FIVE HUNDRED AND NO/100 ($12,500.00) DOLLARS to me in hand paid by **Michigan Municipal Liability and Property Pool** do for ourselves, executors, administrators, successors and assigns, discharge, **ALLEN PARK POLICE OFFICER KEVIN LOCKLEAR and Michigan Municipal Liability and Property Pool, insurer,** together with all other persons, firms and corporations, from any and all claims, demands and actions which I have now or may have arising out of any and all damages, expenses, and any loss or damage resulting from an incident occurring on September 8, 2004.

Each release also stated that "the execution of this agreement shall operate as a satisfaction of my claims against such other parties to the extent that such other parties are or may be entitled to recover, by way of contribution, indemnity, lien or otherwise, from the parties herein released." Additionally, each release stated that plaintiff further agreed to "indemnify and hold harmless the above-named released and discharged parties . . . ." Plaintiff signed the releases, and the trial court entered a stipulated "Order for Dismissal with Prejudice as to Defendants, Allen Park Police Officer Albright and Allen Park Police Officer Locklear, Only."

Approximately two months later, the Melvindale Officers moved for summary disposition under MCR 2.116(C)(7), relying on the Allen Park Officers' releases. The Melvindale Officers asserted that the language "all other persons" contained in the releases effectively released them as well. The trial court denied the Melvindale Officers' motion for summary disposition, agreeing with plaintiff that dismissal based on (C)(7) would only be proper if the releases had been executed before the commencement

4

of plaintiff's suit. Furthermore, the trial court ruled that the Melvindale Officers could only have relied on the releases if they had raised the language as a defense in their first responsive pleading.

The Melvindale Officers moved to amend their affirmative defenses in order to include the language of the releases as a defense. The Melvindale Officers relied heavily on *Romska*. In *Romska*, the Court of Appeals majority held that the language "all other parties" in a release was unambiguous and, therefore, there was "no need to look beyond the . . . language of the release" to determine its scope.[2] The Melvindale Officers argued that the language "all other persons" contained within the releases was clear and unambiguous, just as the language in the release in *Romska* was. Thus, the Melvindale Officers asserted that they too were released by the language "all other persons" and that parol evidence should not be used to determine the scope of the Allen Park Officers' releases.

The trial court denied the Melvindale Officers' motion to amend their affirmative defenses and rejected their argument that the language of the releases was broad enough to release them as well. The trial court instead found the releases to be ambiguous, noting that the names of the Allen Park Officers and their insurance carrier were in capital letters and bold type, which suggested the limiting nature of the language. This bold type was used in both the first and last paragraphs of the releases, which the trial court reasoned was further indication that the releases were intentionally limited to the

---

[2] *Romska*, 234 Mich App at 515-516.

persons named in bold. The trial court additionally noted that the Melvindale Officers were not mentioned anywhere in the releases.

After concluding that the releases were ambiguous and, therefore, that parol evidence was admissible, the trial court noted that the dismissal order entered as a result of the releases was entitled "Order for Dismissal with Prejudice as to Defendants, Allen Park Police Officer Albright and Allen Park Police Officer Locklear, Only." The order also indicated that the "entry of this Order does not resolve the last pending claim between the parties and does not close the case." Additionally, the trial court acknowledged an affidavit from the attorney for the Allen Park Officers explaining that he had intended to negotiate the releases with plaintiff for the Allen Park Officers only.

The trial court further indicated that the amount of consideration for the releases indicated that they were not meant to dispose of claims against the Melvindale Officers. The case-evaluation awards against the Melvindale Officers totaled $1,450,000, while the releases were executed in exchange for the $25,000 combined case-evaluation amount against the Allen Park Officers. The trial court reasoned that it was unlikely that plaintiff would forgo his claims against the Melvindale Officers for just $25,000.

Plaintiff filed an emergency motion to reform the releases. However, before any decision on that motion, the Melvindale Officers filed an application for leave to appeal in the Court of Appeals. The Court of Appeals found *Romska* instructive and concluded

6

that the Allen Park Officers' releases were unambiguous and must be applied as written.[3] The Court of Appeals therefore concluded that plaintiff's claims against the Melvindale Officers were barred.[4] The Court of Appeals reversed the trial court's order denying the Melvindale Officers' motion for summary disposition and remanded the case to the trial court for entry of judgment in favor of the Melvindale Officers.[5]

Plaintiff filed an application for leave to appeal in this Court. We ordered that oral argument be heard on the application, directing the parties to address "whether *Romska v Opper,* 234 Mich App 512 (1999), was correctly decided."[6]

## II.  STANDARD OF REVIEW

This Court reviews de novo decisions on motions for summary disposition.[7] When determining whether a motion for summary disposition brought pursuant to MCR 2.116(C)(7) was properly decided, we consider all documentary evidence and accept the complaint as factually accurate unless affidavits or other documents presented

---

[3] *Shay v Aldrich*, unpublished opinion per curiam of the Court of Appeals, issued March 5, 2009 (Docket No. 282550), p 3-4.

[4] *Id*. at 4.

[5] *Id*. at 5.

[6] *Shay v Aldrich*, 485 Mich 911 (2009).

[7] *Herald Co v Bay City*, 463 Mich 111, 117; 614 NW2d 873 (2000).

specifically contradict it.[8] This issue also involves questions of law regarding the construction of a contract, which we review de novo as well.[9]

## III. ANALYSIS

### A. THE *ROMSKA* DECISION

In *Romska*, the plaintiff was driving her car when she was struck by a car driven by Veliko Velikov.[10] Velikov hit the plaintiff's car after swerving to avoid a vehicle driven by the defendant, David Opper.[11] The plaintiff filed personal injury claims against both Velikov's and Opper's insurance carriers and was able to reach a settlement with Velikov's carrier, Farm Bureau Insurance Company, for $45,000.[12] She executed a standard release form, releasing Farm Bureau, as well as "all other parties, firms, or corporations who are or might be liable."[13]

The plaintiff was unable to reach a settlement with Opper's carrier, American States Insurance Company.[14] As a result, the plaintiff filed suit against Opper himself.[15]

---

[8] *Kuznar v Raksha Corp*, 481 Mich 169, 175-176; 750 NW2d 121 (2008).

[9] *In re Eggbert R Smith Trust*, 480 Mich 19, 23-24; 745 NW2d 754 (2008).

[10] *Romska*, 234 Mich App at 513.

[11] *Id*.

[12] *Id*. at 513-514.

[13] *Id*. at 514.

[14] *Id*.

[15] *Id*.

Opper then moved for summary disposition, relying on the language "all other parties" in the Farm Bureau release.[16]

In a split decision, the Court of Appeals held that the language of the Farm Bureau release was unambiguous.[17] Because Opper could be classified within the phrase "all other parties, firms or corporations who are or might be liable," the majority reasoned that there was "no need to look beyond the plain, explicit, and unambiguous language of the release in order to conclude that he has been released from liability."[18]

The majority noted that the plaintiff provided and received adequate consideration under the release and, thus, the release was valid.[19] Additionally, the majority gave weight to the existence of a merger clause within the release, reasoning that the clause dictated that "disputes concerning the release are to be resolved exclusively by the resort to the language of the release itself."[20] Therefore, the majority concluded that in order to give effect to the merger clause, it must not consider extrinsic evidence that might have been otherwise considered had the merger clause not been included.[21]

---

[16] *Id.*

[17] *Id.* at 515. The Court of Appeals majority opinion was authored by then Judge MARKMAN and joined by Judge SAAD. Judge HOEKSTRA authored a partial concurrence and partial dissent.

[18] *Id.*

[19] *Id.* at 516.

[20] *Id.* at 516-517.

[21] *Id.*

The majority went on to reason that the settling parties likely included broad language in the release for the purpose of avoiding future legal burdens that could potentially arise out of lawsuits brought by the plaintiff against third parties.[22] The majority cautioned that finality might never be truly achieved through a release if even unambiguous release language, coupled with a merger clause, cannot effectively preclude such future lawsuits.[23]

In contrast, the partial dissent opined that when a "stranger" to a release seeks to apply broad language contained in a release to bar claims against the stranger, it *is* appropriate for a court to consider parol evidence of intent in order to determine the true scope of the release.[24] The partial dissent noted that Michigan's Legislature abolished in MCL 600.2925d the common-law principle that the release of one joint tortfeasor is the release of all.[25] The partial dissent opined that it would be fundamentally unfair to bar the plaintiff's claim against Opper on the basis of the broad release language because this would effectively deprive the plaintiff of a cause of action against a tortfeasor whom she did not intend to release.[26]

---

[22] *Id*. at 517-518.

[23] *Id*.

[24] *Id*. at 533 (HOEKSTRA, J., concurring in part and dissenting in part).

[25] *Id*. at 527.

[26] *Id*. at 528.

The partial dissent acknowledged that an unambiguous document must generally be interpreted "solely on the basis of the information contained within its four corners," but it noted that this situation "is not always the case."[27] The partial dissent concluded as follows:

> Indeed, this Court, too, has stated that it agrees with "the majority of courts which hold that the parol evidence rule cannot be invoked either by or against a stranger to the contract." *Denha v Jacob*, 179 Mich App 545, 550; 446 NW2d 303 (1989), citing 30 Am Jur 2d, Evidence, § 1031, pp 166-167. Therefore, because the parol evidence rule is operative only with respect to parties to a document, it cannot be invoked either by or against a stranger to the contract. Hence, in order to determine the intentions of the parties about the scope of a general release, extrinsic evidence should be allowed to determine whether a stranger may rely on the omnibus language "all other parties, firms, or corporations" that is contained within a release.[28]

## B. WHETHER *ROMSKA* AND THIS CASE WERE CORRECTLY DECIDED

In *Romska*, the majority and partial dissent presented opposing views regarding a question critical to the resolution of this matter: May a court properly consider extrinsic evidence of the settling parties' intent regarding the scope of a release when a nonparty to the release attempts to rely on broad release language? We conclude that courts may consider extrinsic evidence of the intended scope of a release when an unnamed party seeks to enforce third-party-beneficiary rights based on the broad release language but the

---

[27] *Id.* at 531.

[28] *Id.* at 533.

evidence presented establishes that an ambiguity exists with respect to the intended scope of the release.

At common law, the release of one joint tortfeasor effectively released all other joint tortfeasors.[29]   In 1974, however, the Michigan Legislature abrogated the common-law rule and dictated by statute that the release of one joint tortfeasor from liability does not automatically release other joint tortfeasors from liability *unless the terms of the release so provide*.[30]

This Court has traditionally applied theories of contract law to disputes regarding the terms of a release.[31]   "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties.  To this rule all others are subordinate."[32]   Generally, if the language of a contract is unambiguous, it is to be construed according to its plain meaning.[33]   On the other hand, if the language of a contract is ambiguous, courts may consider extrinsic evidence to determine the intent of the parties.[34]   Applying this principle, the Court of Appeals majority in *Romska* concluded that "[t]here cannot be any

---

[29] *Slater v Ianni Constr Co*, 268 Mich 492, 494; 256 NW 495 (1934).

[30] MCL 600.2925d(a).

[31] See *Denton v Utley*, 350 Mich 332, 335-338; 86 NW2d 537 (1957).

[32] *McIntosh v Groomes*, 227 Mich 215, 218; 198 NW 954 (1924).

[33] *Grosse Pointe Park v Mich Muni Liability & Prop Pool*, 473 Mich 188, 197-198; 702 NW2d 106 (2005) (opinion by CAVANAGH, J.).

[34] *Id*. at 198.

12

broader classification than the word 'all,' and 'all" leaves room for no exceptions."[35] Therefore, the majority reasoned that it would be "inappropriate to look to parol evidence here in determining the scope of the release."[36]

In this case, the trial court found the broad release language ambiguous and denied the Melvindale Officers' motion for summary disposition after considering extrinsic evidence that neither plaintiff nor the Allen Park Officers had intended that the Melvindale Officers would also be released by the documents executed. The Court of Appeals, however, noted that the releases "use the same broad language as the release at issue in *Romska*, and they also employ the word 'all.'"[37] Therefore, the Court of Appeals concluded that the trial court erred by considering extrinsic evidence of the intentions of plaintiff and the Allen Park Officers and ordered that judgment be entered for the Melvindale Officers.[38] We disagree with the Court of Appeals' conclusion.

First and foremost, it is undisputed that the Melvindale Officers were not involved in the Allen Park Officers' settlement negotiations with plaintiff, were not named in the executed releases, and did not sign the releases. The parties negotiating the releases included plaintiff and the Allen Park Officers only. Plaintiff presented an affidavit from counsel for the Allen Park Officers stating:

---

[35] *Romska*, 234 Mich App at 515-516.

[36] *Id*. at 516.

[37] *Shay*, unpub op at 4.

[38] *Id*. at 5.

13

My only intent with regard to the Release, Settlement and Order of Dismissal was to release my clients, defendant Allen Park Officers Albright and Locklear, from liability in this matter for the consideration of the $25,000.00 Case Evaluation Award.

Additionally, during oral argument in this Court, counsel for the Melvindale Officers conceded that plaintiff and the Allen Park Officers, as the only parties negotiating the releases, did not intend to release the Melvindale Officers.

The Melvindale Officers have not asserted that they were parties to the release negotiations and executions; rather, they simply seek to benefit from the boilerplate language contained in the Allen Park Officers' releases. Again, the Melvindale Officers concede that neither plaintiff nor the Allen Park Officers intended to release them from liability.[39]

Acknowledging that they were not parties to the releases, the Melvindale Officers argue that they were nevertheless released from liability by the Allen Park Officers' releases because they are third-party beneficiaries of the agreement between plaintiff and the Allen Park Officers. MCL 600.1405 governs the rights of third-party beneficiaries in Michigan and states, in pertinent part:

Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promise.

---

[39] During oral argument, defense counsel conceded that neither plaintiff nor the Allen Park Officers intended to release the Melvindale Officers from liability. Nevertheless, defense counsel requested that this Court conclude that the broad release language created third-party-beneficiary rights in the Melvindale Officers.

(1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person.

This Court has interpreted the applicable statutory language as follows:

In describing the conditions under which a contractual promise is to be construed as for the benefit of a third party to the contract in § 1405, the Legislature utilized the modifier "directly." Simply stated, *section 1405 does not empower just any person who benefits from a contract to enforce it. Rather, it states that a person is a third-party beneficiary of a contract only when the promisor undertakes an obligation "directly" to or for the person.* This language indicates the Legislature's intent to assure that contracting parties are clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract, before the third party is able to enforce the contract.[40]

This Court has additionally explained that "a third-party beneficiary may be a member of a class, but the class must be sufficiently described."[41] Thus, in order for the Melvindale Officers to qualify as third-party beneficiaries, the language of the releases must have demonstrated an undertaking by plaintiff *directly* for the benefit of the Melvindale Officers or for a sufficiently designated class that would include the Melvindale Officers.[42]

An objective standard must be used to determine from the release documents whether plaintiff executed the releases directly for the benefit of the Melvindale

---

[40] *Koenig v South Haven*, 460 Mich 667, 676-677; 597 NW2d 99 (1999) (emphasis added).

[41] *Id*. at 680.

[42] See *id*. at 683.

Officers.[43]   The trial court did not conclude that the language used in the releases indicated that they were executed directly for the benefit of the Melvindale Officers. Instead, the trial court found that the language appeared intentionally limiting in nature, noting that the Allen Park Officers were named in bold font while the Melvindale Officers were not named anywhere in the documents.

While the trial court acknowledged that the release in *Romska* contained similar broad language, it concluded that *Romska* was distinguishable from the present case for various reasons.  The trial court noted that the Melvindale Officers rejected the case-evaluation awards against them, a trial date was set for them, and the court entered a consent order indicating that plaintiff's case was dismissed against the Allen Park Officers *only*.  Therefore, it is undisputed that the Melvindale Officers remained parties to plaintiff's lawsuit after the Allen Park Officers were released.

The trial court correctly concluded that plaintiff, the Allen Park Officers, and the Melvindale Officers were aware that the Melvindale Officers would remain parties to plaintiff's lawsuit after the releases were executed.  However, as previously explained, this Court has long held that the standard for determining whether a person is a third-party beneficiary is an objective standard and must be determined from the language of the contract only.[44]  A majority of this Court has affirmed this rule in recent cases and

---

[43] *Brunsell v Zeeland*, 467 Mich 293, 297-298; 651 NW2d 388 (2002).

[44] See, e.g., *Guardian Depositors Corp v Brown*, 290 Mich 433, 437; 287 NW 798 (1939) (stating that "[t]he standard which the legislature has prescribed for determining when a 'promisor * * * has undertaken' to perform or refrain from performing a given

further emphasized that the promise must be made *directly* for the person and, thus, that incidental beneficiaries of contracts could not recover.[45]

This rule reflects "the Legislature's intent to ensure that contracting parties are clearly aware that the scope of their contractual undertakings encompasses a third party, directly referred to in the contract, before the third party is able to enforce the contract."[46] Although if taken out of context this sentence could be read to mean that the important inquiry is the subjective understanding of the contracting parties, when read in context, it is clear that contracting parties' "intent" with regard to third-party beneficiaries is to be determined solely from the "form and meaning" of the contract.[47]

Given this Court's long history of interpreting the third-party-beneficiary statute to require an objective interpretation of the language, we conclude that the Melvindale Officers qualify as third-party beneficiaries under the applicable statute because on its face, the release language unambiguously releases "all other persons."

Once it has been determined that a party qualifies as a third-party beneficiary, we must address the significance of this determination. This Court has held that the

---

act, we think, is an objective one, determined from the form and meaning of the contract itself").

[45] See *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422, 428; 670 NW2d 651 (2003); *Brunsell*, 467 Mich at 296-298.

[46] *Brunsell*, 467 Mich at 297.

[47] See *Koenig*, 460 Mich at 680 (stating that "an objective standard is to be used to determine from the contract itself whether the promisor undertook 'to give or to do or to refrain from doing something directly to or for' the putative third-party beneficiary") (citation omitted; emphasis omitted).

significance of a party being recognized under the third-party-beneficiary statute is that the status confers on parties a cause of action and the right to sue.[48] A party who qualifies as a third-party beneficiary effectively "stands in the shoes" of the original promisee and "has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee."[49]

The third-party-beneficiary statute expressly provides that the rights of the third-party beneficiary are "subject always to such express or implied conditions, limitations, or infirmities of the contract to which the rights of the promisee or the promise are subject."[50] Thus, a person who qualifies under the third-party-beneficiary statute gains the right to sue to enforce the contract. But in doing so, that person stands in the shoes of the original promisee and only gains the same right that the original promisee would have had. Accordingly, a third-party beneficiary is not automatically entitled to the sought-after benefit merely by *qualifying* as a third-party beneficiary. While a third-party beneficiary has the right to seek enforcement of a promise, courts must still apply

---

[48] See *id*. at 684, *Lidke v Jackson Vibrators, Inc*, 379 Mich 294, 300; 150 NW2d 737 (1967), and *Guardian Depositors*, 290 Mich at 442; see also *Williams v Polgar*, 391 Mich 6, 14; 215 NW2d 149 (1974) (recognizing third-party beneficiaries as an exception to the common-law privity rule).

[49] MCL 600.1405.

[50] MCL 600.1405(2)(a).

basic principles of contract interpretation when determining the extent of the third party's rights under the contract.[51]

Accordingly, an objective test is used to determine whether a third party is entitled to pursue a cause of action for enforcement of a contract promise, but that same objective test does not also govern the interpretation of the contract. Instead, the usual principles of contract interpretation apply, and the promise is subject to the same "limitations" and "infirmities" as it would be if it were being enforced by the original promisee.[52] On the face of the release documents, the Melvindale Officers are third-party beneficiaries of the promise, i.e., the release from liability, and may seek to enforce it. Given that we have determined that the Melvindale Officers are third-party beneficiaries, we must now apply traditional principles of contract interpretation to determine the scope of the Melvindale Officers' rights under the release.

As previously stated, releases are generally treated as contracts under Michigan law and, thus, subject to the parol evidence rule, which prohibits the use of extrinsic

---

[51] See, e.g., *Lidke*, 379 Mich at 299-300 (affirming the trial court's determination that the plaintiff was "entitled to maintain a cause of action" as a third-party beneficiary of a contract and proceeding to analyze the extent of the plaintiff's rights under the contract), *Greenless v Owen Ames Kimball Co*, 340 Mich 670, 677; 66 NW2d 227 (1954) (remanding the case to the trial court to interpret the contract on the merits after this Court determined that the plaintiff was "entitled to maintain his cause of action under the third-party beneficiary statute"), and *Szymanski v John Hancock Mut Life Ins Co*, 304 Mich 483; 8 NW2d 146 (1943) (the named beneficiary of her deceased husband's insurance contract was able to sue to attempt to enforce her rights but ultimately unable to recover because this Court determined that the promise she sought to enforce did not extend to the relief that she was seeking).

[52] See MCL 600.1405(2)(a).

evidence to interpret unambiguous language within a document.[53]  However, if a contract is ambiguous, then "extrinsic evidence is admissible to determine the actual intent of the parties."[54]

An ambiguity may either be patent or latent.  This Court has held that extrinsic evidence may not be used to identify a patent ambiguity because a patent ambiguity appears from the face of the document.  However, extrinsic evidence may be used to show that a latent ambiguity exists.[55]  With respect to a latent ambiguity, we have explained as follows:

> A latent ambiguity, however, is one "that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied or executed."  Because "the detection of a latent ambiguity requires a consideration of factors outside the instrument itself, extrinsic evidence is obviously admissible to prove the existence of the ambiguity, as well as to resolve any ambiguity proven to exist."[56]

A latent ambiguity exists when the language in a contract appears to be clear and intelligible and suggests a single meaning, but other facts create the "'necessity for

---

[53] See, generally, *Paul v Univ Motor Sales Co*, 283 Mich 587; 278 NW 714 (1938).

[54] *Grosse Pointe Park*, 473 Mich at 198 (opinion by CAVANAGH, J.).

[55] *Id.* at 198-201; *McCarty v Mercury Metalcraft Co*, 372 Mich 567, 575; 127 NW2d 340 (1964); *Sault Ste Marie Tribe of Chippewa Indians v Granholm*, 475 F3d 805, 812 (CA 6, 2007) (applying the "well-settled tenet of Michigan contract law" that extrinsic evidence may be admitted to identify and interpret a latent ambiguity).

[56] *Grosse Pointe Park*, 473 Mich at 198 (opinion by CAVANAGH, J.) (citations omitted).

interpretation or a choice among two or more possible meanings.'"[57]  To verify the existence of a latent ambiguity, a court must examine the extrinsic evidence presented and determine if in fact that evidence supports an argument that the contract language at issue, under the circumstances of its formation, is susceptible to more than one interpretation.[58] Then, if a latent ambiguity is found to exist, a court must examine the extrinsic evidence again to ascertain the meaning of the contract language at issue.[59]

The latent-ambiguity doctrine has a long history in Michigan law, as demonstrated by *Ives v Kimball*, 1 Mich 308, 313 (1849), in which this Court explained that a latent ambiguity may be shown by parol evidence:

> There is no more useful, just and practical rule of law, than that which admits evidence of surrounding circumstances and collateral facts, within certain well defined limits, for the purpose of enabling courts to ascertain and carry into effect the intention of contracting parties. The cases in which this rule has been applied are almost innumerable.

---

[57] *McCarty*, 372 Mich at 575 (citation omitted).  See also *In re Kremlick Estate*, 417 Mich 237; 331 NW2d 228 (1983), in which a will bequeathed half of an estate to the "Michigan Cancer Society," which was an existing organization that could have received the money from the estate pursuant to the terms of the will.  Thus, the language could have been applied *without* confusion.  Nonetheless, this Court permitted extrinsic evidence to show that the grantor actually intended the beneficiary to be the "Michigan Division of the American Cancer Society" instead, explaining that a latent ambiguity can arise "'where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates' the possibility of more than one meaning.'"  *Id*. at 240, quoting *In re Butterfield Estate*, 405 Mich 702, 711; 275 NW2d 262 (1979).

[58] *Goodwin, Inc v Orson E Coe Pontiac, Inc*, 392 Mich 195, 206; 220 NW2d 664 (1974).

[59] *Id*. at 206, 209-210.

This Court has applied the latent-ambiguity doctrine when extrinsic evidence demonstrates that there is an ambiguity concerning the identity of the intended beneficiary of a promise in a contract. In *Hall v Equitable Life Assurance Society of the United States*, in the context of an insurance contract, this Court stated "'[w]here *from the evidence which is introduced*, there arises a doubt as to what party or parties are to receive the benefit of the policy, parol evidence is admissible to determine such fact.'"[60] In *Hall*, although the decedent's insurance policy clearly named a certain person as the beneficiary, extrinsic evidence made it clear that the decedent had only intended to name that person temporarily, as a guardian, until he determined who would properly act as the guardian of his estate, but he died before being able to make that determination. This Court applied the latent-ambiguity doctrine and held that even though a specific person was unambiguously named in the policy, the proceeds would go to the estate generally.[61]

In addition, this Court noted in *Meyer v Shapton*, 178 Mich 417, 425; 144 NW 887 (1914), that "parol evidence may be admitted to correct, identify, or explain the name given and party intended in writing as grantee, devisee, or promisee, not to pervert the written instrument, but to prevent the written instrument being perverted from the true intent of the contracting parties."[62] In *Meyer*, one of the named parties in a contract

---

[60] *Hall v Equitable Life Assurance Society*, 295 Mich 404, 411; 295 NW 204 (1940) (emphasis added; citation omitted).

[61] *Id.*

[62] In *Meyer*, the disputed language was given a meaning by the courts that was inconsistent with the plain meaning of the language itself because the seller in the

22

of sale was a corporation that no longer existed, and, rather than voiding the contract, the Court examined the surrounding circumstances to determine who the intended party really was.[63]

We do not dispute that the Melvindale Officers are "persons," as the term is used in the releases. In fact, it is possible that any person in the world could fall into this broadly defined group of "all other persons." However, this conclusion alone does not dictate that we must apply the release language to the Melvindale Officers without even considering whether an ambiguity arises from the undisputed extrinsic evidence presented by plaintiff.[64] Courts are obligated in construing releases such as those at issue,

---

contract at issue was designated as "Meyer Bros." when, in fact, the extrinsic evidence indicated that "Herman C. Meyer" was the intended seller and that "Meyer Bros." was no longer in existence.

[63] *Id*. at 424-425.

[64] The Third Restatement of Torts expressly addresses what it characterizes as the "frequently occurring problem" of "a plaintiff [who] enters into a release with a defendant that releases the defendant and provides that it also releases 'all persons' . . . ." Restatement Torts, 3d, Apportionment of Liability, § 24, comment g, p 302. The reporter's note to comment g states that some jurisdictions inquire "into the intent of the parties to the settlement agreement" and "[s]ome require a showing by the plaintiff *that the 'all persons' language is ambiguous* or constitutes a mistake . . . ." *Id*. at 307.

The Restatement adopts this "intent" approach, relying on Professor Corbin, and explains that "[c]ontract law permits inquiry into extrinsic evidence that might explain the negotiations of the parties, the circumstances in which the release was prepared, the respective goals of the parties in entering into the settlement and release . . . ." *Id*. In contrast, the Restatement rejects the approach adopted in *Romska*, noting that only a "distinct minority" of jurisdictions treat the "'all persons' language as unambiguous, which therefore cannot be challenged by extrinsic evidence of the parties' intent." *Id*. at 306.

to effectuate the intent of the parties, and extrinsic evidence is admissible to the extent necessary to do so.[65]

Plaintiff presented extrinsic evidence to support his argument that the release language is ambiguous, including the following facts: (1) the Allen Park Officers and the Melvindale Officers were represented by different counsel, (2) it was expressly agreed that plaintiff would accept the combined $25,000 case-evaluation awards with respect to the Allen Park Officers, but would not accept the $1.5 million award with respect to the Melvindale Officers, (3) counsel for the Allen Park Officers explained to plaintiff that the releases were drafted in order to settle plaintiff's claims against his clients, (4) a stipulation and order dismissing the Allen Park Officers *only* was entered, and (5) the Melvindale Officers remained parties to plaintiff's lawsuit with a trial date set for plaintiff to proceed against them. The extrinsic evidence is further bolstered by the affidavit from counsel for the Allen Park Officers—the drafter of the releases—indicating that when he drafted the releases, he had not intended to provide for the release of the Melvindale Officers as well.

Again, a latent ambiguity has been described as one that "'arises not upon the words of the will, deed or other instrument, as looked at in themselves, but upon those words when applied to the object or to the subject which they describe.'"[66] "'And where, from the evidence which is introduced, there arises a doubt as to what party or parties are

---

[65] *Grosse Pointe Park*, 473 Mich at 198 (opinion by CAVANAGH, J.).

[66] *Hall*, 295 Mich at 409 (citation omitted).

to receive the benefit [of a contract], parol evidence is admissible to determine such fact.'"[67] "In construing [contractual] provisions due regard must be had to the purpose sought to be accomplished by the parties as indicated by the language used, read in the light of the attendant facts and circumstances."[68] "Such intent when ascertained must, if possible, be given effect and must prevail as against the literal meaning of expressions used in the agreement."[69]

The extrinsic evidence presented here is not disputed by the Melvindale Officers, and it undeniably reveals the clear intent of the parties. Furthermore, the language of the releases expressly contemplates a situation in which the Allen Park Officers might be liable by way of contribution or indemnity to another party. This language implies the existence of the continued lawsuit against other parties. Given the undisputed extrinsic facts that the Melvindale Officers remained parties to plaintiff's lawsuit and were former codefendants of the Allen Park Officers, it would be entirely reasonable for the Allen Park Officers to include language in the releases that would protect them from actions for contribution or indemnity by remaining parties. Considering the language of the releases and the extrinsic evidence presented, it is clear that the settling parties did not include the term "persons" in the releases in order to effectuate an intent to release the Melvindale Officers from liability.

---

[67] *Id*. at 411 (citation omitted).

[68] *W O Barnes Co, Inc v Folsinski*, 337 Mich 370, 376-377; 60 NW2d 302 (1953).

[69] *Id*. at 377.

It is an elementary rule of construction of contracts that in case of doubt, a contract is to be strictly construed against the party by whose agent it was drafted.[70] However, the drafter here *agrees* with plaintiff's assertions about the intent of the settling parties. Not only are the settling parties in full agreement about their intent, but the Melvindale Officers do not even seriously contest this point and have expressed agreement with this same intent. There is no indication whatsoever that counsel for either the Allen Park Officers or the Melvindale Officers took any action in relation to this matter without their clients' agreement. Any suggestions to the contrary are entirely unfounded.

This is simply not a case in which a stranger to a contract or release comes forward sometime after the formation of the contract or release and seeks to benefit from its terms. Instead, the Melvindale Officers were readily ascertainable codefendants in a pending lawsuit by plaintiff. In addition, this is not a case in which there is any legitimate dispute about the settling parties' intent. Defendants do not even dispute the parties' actual intent.

Under the facts of this case, if plaintiff were not permitted to present extrinsic evidence in order to ascertain the intent of the settling parties, the settling parties' intent would undoubtedly be perverted.[71] Plaintiff would be deprived of his claim for assault and battery against the Melvindale Officers, which he expressly preserved by rejecting

---

[70] *Mich Chandelier Co v Morse*, 297 Mich 41, 46; 297 NW 64 (1941).

[71] *Meyer*, 178 Mich at 424-425.

the case-evaluations awards assessed against them. In addition, counsel for the Allen Park Officers would be deemed responsible for releasing the Melvindale Officers' from liability when it was not his intention to do so. Further, the Melvindale Officers would obtain a complete windfall by being released from liability for their acts in exchange for no bargained-for promise and no consideration at all, despite the fact that they do not dispute that this was not the intent of the settling parties. Not only would this be an unjust result, it would be contrary to the cardinal rule of contract interpretation: that the contracting parties' intent should control.[72]

In this case, plaintiff has shown that the circumstances surrounding the execution of the releases created a latent ambiguity about whom the parties intended to include within the scope of the releases. All the contracting parties agree that neither plaintiff nor the Allen Park Officers intended the releases to have any effect on the Melvindale Officers' liability. Even the Melvindale Officers *themselves* did not believe that the

---

[72] The dissent, authored by Justice MARKMAN, who also authored *Romska* in the Court of Appeals, is unpersuasive, despite its 32 pages in length, because the arguments are repetitive of Justice MARKMAN's analysis in *Romska*, which we have rejected today. The dissent claims that this decision is inconsistent with the law of this state. To support this claim, the dissent merely provides a string citation to Court of Appeals decisions decided *after Romska*. Given that these lower court decisions were bound by *Romska*, it is hardly remarkable that they utilized *Romska*'s legal analysis. The only other citations offered by the dissent in support of its claim are federal cases. In fact, it is the dissent's limited formulation of the latent-ambiguity doctrine that is inconsistent with cases in which *this* Court has applied that doctrine. See, e.g., *Keller v Paulos Land Co*, 381 Mich 355, 362; 161 NW2d 569 (1968), in which this Court concluded that the parties intended that an easement for "ingress and egress" would be an easement for parking instead, even though this understanding "was not a use of ingress and egress within the common legal meaning."

releases were intended to include them.[73]  Further, it is illogical to think that plaintiff would have accepted the case-evaluation amounts for the Allen Park Officers as consideration for releasing *all* defendants when the claims against the Melvindale Officers had much larger case-evaluation amounts.  Although on the face of the releases the Melvindale Officers are entitled as third-party beneficiaries to seek enforcement of the releases, the releases are subject to the same "limitations" and "infirmities" as they would have been if they had been made directly for those officers.  This means that the release language must be subject to evidence of the latent ambiguity demonstrating that the Melvindale Officers are not included in plaintiff's release from liability of "all other persons."

In sum, to determine whether an unnamed party is released from liability by broad or vague release language, the party's status as a third-party beneficiary must be established by an objective analysis of the release language.  However, traditional contract principles continue to apply to the release, and courts may consider the subjective intent of the named and unnamed parties to the release under certain circumstances, such as when there is a latent ambiguity.  The third-party-beneficiary statute indicates that the Legislature intended to allow parties who are direct

---

[73] This Court has held that when interpreting an ambiguity, it is significant if the relevant parties were aware of the circumstances.  See, e.g., *Loyal Order of Moose v Faulhaber*, 327 Mich 244, 250; 41 NW2d 535 (1950) (noting that when it is necessary for a court to construe an agreement, it must determine the intent of the parties and "[a]s bearing on the question of such intent at the time the contract was made, it was proper to show by parol testimony the actual situation that then existed to the knowledge of defendant as well as plaintiff").

28

beneficiaries to sue to enforce their rights, but the statute expressly states that third-party beneficiaries have only the "same right" to enforce as they would if the promise had been made directly to them. MCL 600.1405. That is, the statute creates a cause of action, but it is not intended to afford third parties greater rights than they would have if they had been the original promisee.

If this Court were to extend the objective test it has adopted for determining whether there is a third-party beneficiary to interpreting the scope of the rights of the third-party beneficiary, it would be contrary to the statute in instances in which, as here, because of the latent-ambiguity doctrine, the subjective intent of the party would be relevant to determining the party's rights if the promise had been made directly to the party. Thus, while the objective approach for determining whether a party is a third-party beneficiary must be applied, traditional contractual principles, including the latent-ambiguity doctrine, must also be applied in order to determine the scope of the third-party beneficiary's rights.

## IV. CONCLUSION

In lieu of granting leave to appeal, we reverse the judgment of the Court of Appeals and overrule *Romska* to the extent that it prohibits a court from considering extrinsic evidence of the intended scope of a release when an unnamed party seeks to enforce third-party-beneficiary rights based on broad language included in a release from liability and an ambiguity exists with respect to the intended scope of that release.

Accordingly, we remand this case to the trial court for further proceedings in conformity with this opinion.

Reversed and remanded.

KELLY, C.J., and CAVANAGH and HATHAWAY, JJ., concurred with WEAVER, J.

## STATE OF MICHIGAN

### SUPREME COURT

NICOLE SHAY, Personal Representative of
the ESTATE OF THOMAS JOHN SHAY,
Deceased,

   Plaintiff-Appellant,

v             No. 138908

JOHN ALDRICH, WILLIAM PLEMONS,
and JOSEPH MILLER,

    Defendants-Appellees,
and

WAYNE ALLBRIGHT and KEVIN
LOCKLEAR,

    Defendants.

_____

MARKMAN, J. (*dissenting*).

Not all cases that come before this Court are defined in terms of their core dispute with as much clarity as this one. At issue here is how a contract is properly read in the state of Michigan. That is, should a contract be read as a function of the parties' subjective intent or should it be read as a function of the unambiguous words of the contract itself? This case is that simple and that significant. Relying on the rule from *Romska v Opper*, 234 Mich App 512; 594 NW2d 853 (1999), which embodied the principles of more than a century of Michigan contract law, the Court of Appeals properly adopted the latter approach, holding that the unambiguous language of an agreement releasing "all other persons" in fact releases "all other persons." *Shay v*

*Aldrich*, unpublished opinion per curiam of the Court of Appeals, issued March 5, 2009 (Docket No. 282550). Today, in reversing the Court of Appeals and overruling *Romska*, a majority of this Court newly adopts the former approach. Because the majority's rule will "engender uncertainty among parties to releases where currently there is none, breed opportunities for litigation where currently there are none, and erode the ability of individuals to fashion their own rules for dispute resolution free of the uncertainties of judicial intervention," I dissent. *Romska*, 234 Mich App at 521.

## I. MICHIGAN CONTRACT LAW

### A. FUNDAMENTAL PRINCIPLES

It has been the rule in Michigan for well over a century that the first and foremost principle of contract law is that unambiguous contracts are not open to judicial construction and must be enforced as written, unless the contract violates public policy. See, e.g., *Henderson v State Farm Fire & Cas Co*, 460 Mich 348, 354; 596 NW2d 190 (1999); *Juif v State Hwy Comm'r*, 287 Mich 35, 41; 282 NW 892 (1938); *Forbes v Darling*, 94 Mich 621, 625; 54 NW 385 (1893). In other words, "an unambiguous contract reflects the parties' intent as a matter of law." *In re Egbert R Smith Trust*, 480 Mich 19, 24; 745 NW2d 754 (2008).

Extrinsic evidence may be admitted to determine the intent of the parties when a contract is ambiguous. *New Amsterdam Cas Co v Sokolowski*, 374 Mich 340, 342; 132 NW2d 66 (1965). Whether a contract is ambiguous is a question of law, which this Court reviews de novo. *Farm Bureau Mut Ins Co of Mich v Nikkel*, 460 Mich 558, 563; 596 NW2d 915 (1999). Michigan courts are not permitted to "create ambiguity where the

2

terms of the contract are clear." *Frankenmuth Mut Ins Co v Masters*, 460 Mich 105, 111; 595 NW2d 832 (1999).

"Ambiguity in written contracts can fairly be said to consist of two types: patent and latent." *Grosse Pointe Park v Mich Muni Liability & Prop Pool*, 473 Mich 188, 198; 702 NW2d 106 (2005) (opinion by CAVANAGH, J.). "'A patent ambiguity is one apparent upon the face of the instrument . . . .'" *Hall v Equitable Life Assurance Society of the United States*, 295 Mich 404, 409; 295 NW 204 (1940) (citation omitted). A contract is patently ambiguous only if, after the court has engaged in its judicial duties of giving effect to the contract's language, the court concludes that a term "is *equally* susceptible to more than a single meaning," *Lansing Mayor v Pub Serv Comm*, 470 Mich 154, 166; 680 NW2d 840 (2004), or that "two provisions of the same contract irreconcilably conflict with each other," *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 467; 663 NW2d 447 (2003).

A latent ambiguity, on the other hand, "'arises not upon the words of the will, deed, or other instrument, as looked at in themselves, but upon those words when applied to the object or to the subject which they describe.'" *Zilwaukee Twp v Saginaw-Bay City R Co*, 213 Mich 61, 69; 181 NW 37 (1921) (citation omitted).[1]   When a court is

---

[1] Justice YOUNG has observed that

[t]he classic example of a latent ambiguity is found in the traditional first-year law school case of *Raffles v Wichelhaus*, 2 Hurl & C 906; 159 Eng Rep 375 (1864). In *Raffles*, two parties contracted for a shipment of cotton "to arrive ex Peerless" from Bombay. However, as it turned out, there were two ships sailing from Bombay under the name "Peerless." Thus, even

3

determining whether a contract contains a latent ambiguity, first "extrinsic evidence is admissible to prove the existence of the ambiguity, and, if a latent ambiguity is proven to exist, extrinsic evidence may then be used as an aid in the construction of the contract." *Grosse Pointe Park*, 473 Mich at 201 (opinion by CAVANAGH, J.). Because the latent-ambiguity doctrine permits the admission of extrinsic evidence *before* an ambiguity is found to exist, it is in tension with the fundamental rule of contracts that when a contact is clear and unambiguous on its face, a court will not consult extrinsic evidence and will enforce the contract as written. See, e.g., *Farm Bureau*, 460 Mich at 566. This Court in *Mich Chandelier Co v Morse*, 297 Mich 41, 48; 297 NW 64 (1941), addressed this tension and provided its proper resolution by making clear that

> "[a]n omission or mistake is not an ambiguity. Parol evidence under the guise of a claimed latent ambiguity is not permissible to vary, add to or contradict the plainly expressed terms of this writing or to substitute a different contract for it to show an intention or purpose not therein expressed." [Citation omitted.]

Similarly, this Court in *Hall*, in finding a latent ambiguity, explained that "'[a]n ambiguity is properly latent, in the sense of the law, when the . . . extrinsic circumstances

---

though the contract was unambiguous on its face, there was a *latent* ambiguity regarding the ship to which the contract referred. [*Grosse Pointe Park*, 473 Mich at 217 n 21 (opinion by YOUNG, J.).]

Thus, at the time the parties in *Raffles* signed the contract, they believed their words to be clear and unambiguous, although an ambiguity lay dormant in the text: unbeknownst to the parties, there happened to be two ships named *Peerless*. Because of that latent ambiguity, it was no longer clear from the four corners of the document what the parties meant by their use of the name *Peerless*, and so parol evidence was properly admitted to determine the parties' intent.

4

to which the words of the instrument refer [are] susceptible of explanation by a mere development of extraneous facts *without altering or adding to the written language . . . .*" *Hall*, 295 Mich at 409 (citation omitted) (emphasis added). Under this proper understanding of the latent-ambiguity doctrine, a court does not "cross the point at which the written contract is *altered* under the guise of contract *interpretation*." *Grosse Pointe Park*, 473 Mich at 218 (opinion by YOUNG, J.). And importantly, pursuant to this understanding, the doctrine's exception, by which extrinsic evidence is permitted to ascertain intent *before* an ambiguity has been found to exist, does not nullify the most basic and fundamental rule of contract law-- that unambiguous contracts are not open to judicial construction and must be enforced as written.

A related and equally settled principle of Michigan contract law is that "'one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms.'" *Farm Bureau,* 460 Mich at 567-568 (citation omitted).[2] While this general rule is not applicable if the failure to read the instrument was "induced by some stratagem, trick, or artifice on the part of the one seeking to enforce the contract," it applies in all situations in which the neglect to read

---

[2] As this Court recognized in 1858,

[t]o hold that a party may reply to an action upon a written instrument, "It is true I made the contract, but it was not my agreement, and I did not intend to be bound by it," would set the law of contracts all afloat, render the certainty of the law a fiction, and place the obligations of parties beyond judicial control. [*Adair v Adair*, 5 Mich 204, 209 (1858).]

5

was because of carelessness alone. *Int'l Transp Ass'n v Bylenga*, 254 Mich 236, 239; 236 NW 771 (1931). Every citizen of this state is on notice of this commonsense and fundamentally fair rule because this Court stated long ago in clear and certain terms that a party to a contract has the "duty to examine the contract, to know what he signed, and complainants cannot be made to suffer for this neglect on his part." *Liska v Lodge*, 112 Mich 635, 637; 71 NW 171 (1897).

There are reasons why these fundamental principles have withstood the test of time and have served as the bedrock of contract law in this state from time immemorial. Courts adhere to these fundamental rules-- enforcing contracts according to their unambiguous terms, responsibly and diligently executing their judicial duty in determining if a contract is ambiguous, and insisting that parties read their contracts-- because "doing so respects the freedom of individuals freely to arrange their affairs via contract." *Rory v Continental Ins Co*, 473 Mich 457, 468; 703 NW2d 23 (2005). "'[T]he general rule [of contracts] is that competent persons shall have the utmost liberty of contracting and that their agreements voluntarily and fairly made shall be held valid and enforced in the courts.'" *Terrien v Zwit*, 467 Mich 56, 71; 648 NW2d 602 (2002) (citation omitted). As *Rory*, 473 Mich at 469, demonstrated, this notion is "ancient and irrefutable":

> It draws strength from common-law roots and can be seen in our fundamental charter, the United States Constitution, where government is forbidden from impairing the contracts of citizens, art I, § 10, cl 1. Our own state constitutions over the years of statehood have similarly echoed this limitation on government power. It is, in short, an unmistakable and ineradicable part of the legal fabric of our society.

6

It is precisely because these fundamental principles are so well settled and so essential to a free society, governed by the equal rule of law, that our citizens' reliance on them is so great. Courts rightly adhere to these rules so as not to upend the expectations of the citizenry in an area of the law that touches upon their personal and commercial relations every day in myriad ways.

## B. *ROMSKA*

With these well-settled principles of Michigan contract law to guide it, our Court of Appeals in *Romska v Opper* was asked to give effect to an unambiguous release that included, in the very first sentence of the document, language releasing "'all other parties, firms, or corporations who are or might be liable . . . .'" *Romska*, 234 Mich App at 514 (emphasis omitted). The plaintiff in *Romska* executed the release as part of a negotiated settlement agreement with the insurer of one of the drivers involved in a three-car accident. She ultimately settled with the insurance company of one of the drivers for $45,000. Unable to reach a settlement with the other driver, David Opper, or with his insurer, the plaintiff filed suit against him. Opper moved for summary disposition based on the release, which the trial court granted, observing, "'[T]his release is clear and unambiguous on its face, it was entered into knowingly and intelligently, and it is clear that the plaintiff acknowledged full settlement and satisfaction of all of her claims that may arise out of this accident.'" *Id.* at 515 n 2.

The Court of Appeals affirmed. Consistent with the established common-law rule governing the legal effect of an unambiguous instrument, the Court reasoned:

7

Because defendant clearly fits within the class of "all other parties, firms or corporations who are or might be liable," we see no need to look beyond the plain, explicit, and unambiguous language of the release in order to conclude that he has been released from liability. "There cannot be any broader classification than the word 'all,' and 'all' leaves room for no exceptions." [*Id.* at 515-516 (citation omitted).][3]

The Court of Appeals partial dissent would have departed from the majority's "common-law" rule by adopting what it termed as an "intent rule," explaining:

While it is generally correct that an unambiguous document must be interpreted solely on the basis of the information contained within its four corners, that is not always the case. When a *stranger* to a release attempts to rely on omnibus language contained within the document, as in this case, parol evidence is admissible to establish whether the parties intended the release to apply to the nonparty. [*Id.* at 531 (HOEKSTRA, J., concurring in part and dissenting in part) (citation omitted).][4]

In response to this proposed rule, and specifically questioning the appropriateness of the partial dissent's adoption of the "intent rule" nomenclature, the *Romska* majority stated:

---

[3] As an additional reason for affirming the trial court, *Romska* noted that the "release contains an explicit merger clause that independently precludes resort to parol evidence" and that a contrary ruling would give "no effect at all to the merger clause by allowing resort to exactly the same extrinsic evidence as might be allowed absent the merger clause." *Romska*, 234 Mich App at 516-517. In the instant case, the releases also contain merger language, as they expressly provide that "all agreements and understandings between the parties in reference thereto are embodied herein." The majority does not even take note of this provision. While the effect of this merger language is not the primary reason why the releases should be enforced as written, the inclusion of that language only strengthens this conclusion. As *Romska* explained, if "clear release language, coupled with a merger clause, does not afford protection against [having to defend against remaining claims], it is hard to understand how finality could ever be achieved through a negotiated release." *Id.* at 518.

[4] While the partial dissent in *Romska* would have permitted parol evidence on its theory that the defendant was a "stranger" to the release, it should be noted that the partial dissent did not find that the release contained any ambiguity, patent or latent.

[I]n our judgment, the common-law rule better deserves this description. The common-law rule holds that a general release of "any and all persons" unambiguously releases "any and all parties." The common-law rule holds that the language of a release should be accorded meaning. It is predicated on the intentions of the parties but, unlike the rule of the dissent, derives such intentions from the language of the release to which they have freely assented. [*Id.* at 517 (majority opinion).]

When *Romska* was appealed in this Court, we denied the plaintiff's application for leave to appeal. *Romska v Opper*, 461 Mich 927 (1999). For the ensuing decade, our Court of Appeals has consistently applied its rule, holding that language in an unambiguous release that releases "all other persons" in fact releases "all other persons," and this Court has consistently denied leave to appeal when sought in cases challenging those rulings.[5] Thus, the citizens of this state and the bench and bar have been on clear notice that an unambiguous release that includes language releasing "all other persons" means what it says.

## II. APPLICATION OF PRINCIPLES

It is against this legal backdrop that this Court is now called upon to give effect to the releases at issue that each include a provision releasing "all other persons . . . from any and all claims . . . resulting from an incident occurring on September 8, 2004."

---

[5] See, e.g., *Meridian Mut Ins Co v Mason-Dixon Lines, Inc (On Remand)*, 242 Mich App 645, 647; 620 NW2d 310 (2000); *Collucci v Eklund*, 240 Mich App 654, 658; 613 NW2d 402 (2000), lv den 463 Mich 934 (2000); *Beck v McKinzie*, unpublished opinion per curiam of the Court of Appeals, issued November 20, 2001 (Docket No. 223680); *Batshon v Mar-Que Gen Contractors, Inc*, 463 Mich 646, 650 n 6; 624 NW2d 903 (2001); *Samuel v Mitsubishi*, unpublished opinion per curiam of the Court of Appeals, issued May 24, 2002 (Docket No. 229464), lv den 467 Mich 953 (2003); *Ruppel v Carlson*, unpublished opinion per curiam of the Court of Appeals, issued November 8, 2002 (Docket No. 235266).

9

Plaintiff, represented by counsel, signed two identical, self-contained, two-page releases, each containing this language in the context of accepting a case-evaluation award with respect to the Allen Park police officers, Wayne Allbright (or Albright) and Kevin Locklear, who were also represented by counsel. Two months after signing the releases, plaintiff provided them to the Melvindale police officers, John Aldrich, William Plemons, and Joseph Miller, who then moved for summary disposition, claiming that the releases' reference to "all other persons" released them from liability. The Court of Appeals unanimously reversed the trial court's denial of summary disposition because it concluded that the language of the releases was unambiguous and operated to bar plaintiff's claims against the Melvindale officers.

I would affirm the Court of Appeals because that court engaged in the proper analysis under Michigan law and correctly determined that the releases here contained no ambiguity and thus, as a matter of law, accomplished what they stated. The burden on the majority is therefore to refute that the releases mean what they say, and to demonstrate that they are somehow ambiguous because they contain either a patent or a latent ambiguity. The question whether the releases contain a patent ambiguity has been in issue throughout this litigation. The trial court found the language of the releases to be ambiguous. And although plaintiff initially took the position that the releases were unambiguous, he subsequently argued on appeal that the releases were "internally inconsistent or ambiguous" on their face.

The majority is less clear in its own determination of whether the releases are patently ambiguous, which, it should be remembered, implicates a court's primary duty

10

in addressing a legal instrument. The majority variously disparages the release language (1) as "broad," albeit without any explanation of why being "broad" is bad or in any way legally suspect, (2) as "vague," without identifying any specific language that is unclear or imprecise, and (3) as "boilerplate language," absent either any justification for this characterization or any explanation of the consequences of such a characterization.[6] The majority also devotes an inordinate amount of time to repeating the trial court's reasons for its conclusion that the releases are patently ambiguous, albeit without actually adopting this conclusion. Apparently, even the majority cannot with a straight face characterize the language of these releases as patently ambiguous. Indeed, it is simply hard to imagine how the three words at issue ("all other persons") could be any *less* "vague" or any *more* comprehensible. As even plaintiff's counsel acknowledged at oral argument, these "three words . . . are certainly broad enough to include [the Melvindale officers]." Without the adoption of Humpty Dumpty's approach to linguistic interpretation in *Through the Looking Glass*-- "'When I use a word, . . . it means just what I choose it to mean—neither more nor less"-- no patent ambiguity can possibly be found in the clear language of these releases.[7]

---

[6] As best as I can understand the significance of the majority's "boilerplate" characterization, I assume that it is to communicate that such language may be safely ignored.

[7] Carroll, *Through the Looking Glass and What Alice Found There*, in *The Annotated Alice* (New York: Bromhill House, 1960), p 269. Equally without merit is plaintiff's argument that the interplay of the language "all other persons" in the releases' first paragraph and the indemnity provision in the third paragraph somehow creates a patent ambiguity. These paragraphs are separate and distinct promises. There is nothing

Not to be deterred by the obviously *un*ambiguous language of the releases, the majority offers the novel argument that the releases contain a *latent* ambiguity. Before discussing the merits of the majority's application of this doctrine, it is important to recognize just how very novel the majority's argument is. Not only was it not raised by any of the parties or lower courts in this case, according to the available caselaw, it has never even been mentioned by *any* court, or by *any* party, that has ever addressed the issue of whether a release containing the language "all other persons," or some variation thereof, is enforceable as written under Michigan law.[8] As in the instant case, the plaintiffs in these other cases claimed that they did not "intend" to release the defendants

---

even slightly inconsistent about the fact that one promise may be broader than another. Nor is there anything inconsistent about the Allen Park officers' desire to obtain maximum security against future claims by including both provisions in the releases. Rather, these simply reflect prudent precautions.

[8] See, e.g., *Meridian*, 242 Mich App at 650; *Collucci*, 240 Mich App at 658; *Heritage Resources Inc v Caterpillar Fin Servs Corp*, 284 Mich App 617, 641-643; 774 NW2d 332 (2009); *Beck*, unpub op at 2-3; *Samuel*, unpub op at 2; *Collier v Thomas*, unpublished opinion per curiam of the Court of Appeals, issued April 26, 2005 (Docket No. 252018); *Murray v Arce*, unpublished opinion per curiam of the Court of Appeals, issued May 20, 2003 (Docket No. 238757); *Ruppel*, unpub op at 2-3; *Whitmore v Ford Motor Co*, unpublished opinion per curiam of the Court of Appeals, issued June 26, 2001 (Docket No. 216132); *Dilorenzo v Kirkpatrick*, unpublished opinion per curiam of the Court of Appeals, issued February 14, 2006 (Docket No. 261748); *Hampton v Ketz*, unpublished opinion per curiam of the Court of Appeals, issued December 13, 2002 (Docket No. 227656); see also *Taggart v United States*, 880 F2d 867, 870 (CA 6, 1989); *Kessler v Nat'l Presto Indus*, 1995 US Dist LEXIS 11015 (ED Mich, June 12, 1995); *Rutcoskey v U-Haul, Inc*, 1994 US Dist LEXIS 12062 (WD Mich, August 1, 1994). When courts have found a release to be ambiguous, and thus distinguished *Romska,* it was because of a *patent* ambiguity created by the release language, not because of any supposed latent ambiguity. See, e.g., *Herrick v Sosnowski*, unpublished opinion per curiam of the Court of Appeals, issued May 24, 2005 (Docket No. 252299).

12

from liability. And, as with plaintiff in the instant case, those plaintiffs offered extrinsic evidence to support their claims.[9] Despite these similarities, *no* court, to the best of my review-- and none is identified by the majority-- has ever detected a latent ambiguity of the sort that the majority unearths today.

Turning to the merits of the majority's latent ambiguity argument, I find no reason to conclude that the majority today gets it right, while every other judge who has addressed this issue has gotten it wrong. The majority concludes that "plaintiff has shown that the circumstances surrounding the execution of the releases created a latent ambiguity about whom the parties intended to include within the scope of the releases." Central to the majority's conclusion is its assertion that "[a]ll contracting parties agree that neither plaintiff nor the Allen Park Officers intended the releases to have any effect on the Melvindale Officers' liability. Even the Melvindale Officers *themselves* did not believe that the releases were intended to include them." This is simply not true. The majority not only frustrates the intent of the parties as expressed by the very words of the releases being nullified here, but fails to consider the parties themselves at all by conflating *their* subjective intent with that of their *attorneys*. Specifically, the majority accepts as evidence of the Allen Park *officers*' intentions an affidavit from their *attorney* explaining that *he* intended to negotiate the releases with plaintiff for the Allen Park

---

[9] The extrinsic evidence offered in these cases often included an affidavit stating that one party did not "intend" to release another from liability-- the exact evidence which the majority here finds dispositive. None of the courts in these cases determined that such evidence created a latent ambiguity. See, e.g., *Meridian*, 242 Mich App at 650; *Beck*, unpub op at 3 n 2.

officers only. Notably, the Allen Park officers themselves, i.e., the *actual* parties, have offered no such sworn statements. Similarly, defense counsel's concession at oral argument that neither plaintiff nor the Allen Park officers intended to release the Melvindale officers from liability is not supported by any statements offered by the Melvindale officers *themselves*.[10]

While the subjective intent of the parties may conceivably have been in accord with that of their attorneys, there are several reasons why it may not be appropriate to reflexively conflate the intent of one with the other, as the majority does. First, given that plaintiff might conceivably have a legal malpractice claim against his attorney if the releases were read to mean what they say, the latter's assertions regarding his client's intentions should be approached with some measure of caution, absent clearer evidence in this regard. Second, it would hardly be remarkable to suppose that there might be some sense of empathy on the part of police officers in one community toward police officers in a neighboring community who have become the target of a lawsuit alleging assault and battery, such a lawsuit being an occupational hazard for even those police officers conducting themselves in the most highly professional manner. Therefore, the Allen Park officers' subjective intent in settling with plaintiff may well have been different from their attorney's subjective intent, especially in view of the reality that including the Melvindale officers within the scope of the releases would not have

---

[10] Although the majority finds defense counsel's opinion that there was "no actual subjective intent to release [his] clients" to be significant, it is not clear how defense counsel can conclusively know the *other* parties' subjective intent.

14

diminished in any way complete release of the Allen Park officers from liability. For these reasons, absent an affidavit from the Allen Park officers themselves, it is not obvious to me why their *lawyer's* subjective intentions with regard to the Melvindale officers are necessarily and conclusively reflective of the intentions of these officers themselves.[11]

However, even if the majority's consideration of the extrinsic evidence presented in this case were sound, it still could not salvage its latent ambiguity analysis because no latent ambiguity exists in these releases; that is, no ambiguity is created when the unambiguous words "all other persons" are "'applied to the object or to the subject which they describe.'" *Zilwaukee Twp*, 213 Mich at 69 (citation omitted). Again, the provision at issue releases "all other persons . . . from any and all claims . . . resulting from an incident occurring on September 8, 2004." It is to state what is beyond obvious to almost all but the majority to say that the Melvindale officers are "persons." They were involved in "an incident occurring on September 8, 2004," and that incident resulted in plaintiff's

---

[11] As additional evidence of the claimed latent ambiguity, the majority relies on the fact that plaintiff and the Allen Park officers accepted case-evaluation awards and that plaintiff and the Melvindale officers rejected a larger award. I question the wisdom of the precedent the majority sets with its reliance on this information because such information is protected in nonjury trials. See MCR 2.403(N)(4). While the trial court was not acting here as fact-finder, the majority's use of this information creates a perverse incentive for future parties to disclose award amounts precisely in order to prove the existence of a claimed ambiguity and thereby nullify a release that otherwise provides litigative finality. Using the information in this manner is incompatible with the goal of case evaluation, which is "to expedite and simplify the final settlement of cases." *Bennett v Med Evaluation Specialists*, 244 Mich App 227, 231; 624 NW2d 492 (2000).

"claims."[12] Where is the latent ambiguity that is created when these words are applied to the "subject which they describe"?

There *is* no such latent ambiguity, of course, a conclusion that is confirmed when the purported latent ambiguity here is compared to actual latent ambiguities that courts have properly found in other cases, some of which the majority cites in support of its decision. For instance, in *Raffles v Wichelhaus*, 2 Hurl & C 906; 159 Eng Rep 375 (1864), the textbook latent-ambiguity case, such an ambiguity was created when the contractual provision stating that the shipment was "'to arrive ex "Peerless"'" was applied to the subject it described because unbeknownst to the parties, there happened to be two ships named *Peerless* sailing on that particular day. In *Hall*, this Court properly found that a latent ambiguity was created when the language naming "Emma H. Foote (guardian)" as the beneficiary of an insurance contract was applied to the subject it described because Emma H. Foote was never the decedent's guardian. *Hall*, 295 Mich at 410. And in *Meyer v Shapton*, 178 Mich 417, 424-425; 144 NW 887 (1914), this Court reasonably found that a latent ambiguity was created when the designation of the seller in

---

[12] The majority does not even consider the entire sentence at issue in its latent-ambiguity analysis. It states that, although it "do[es] not dispute that the Melvindale Officers are 'persons,'" "any person in the world could fall into this broadly defined group . . . ." To begin with, while the majority is apparently offended by the result of this "broad' language, it does not identify the *legal* principle under which that result is impermissible, because there is no such principle. Further, the majority's statement here is not even accurate. By their clear terms, the contracts at issue released "all . . . persons" from claims resulting from the "incident occurring on September 8, 2004." That is, the contracts released persons from certain *specific* claims. The Melvindale officers certainly fall within this specifically defined group, but not all "person[s] in the world" do.

16

a contract of sale, "Meyer Bros.," was applied to the subject it described because the corporate entity Meyer Bros. had been out of existence for years.

The contracts in each of these cases contained genuine latent ambiguities, and the courts properly applied the relevant doctrine. However, these cases are so far afield from the case before us that it is simply impossible to apply their reasoning. Indeed, the majority does not even *attempt* to do so, for what could it argue-- that, unbeknownst to the parties at the time they signed the releases, the Melvindale officers were actual "persons"? While the majority relies on *Hall* and *Meyer*, these cases, with their examples of true latent ambiguities, in actuality cast into relief the utter lack of serious legal underpinnings of the majority's argument. And it becomes increasingly clear that, in its decision today, the majority misuses the latent-ambiguity doctrine, in contravention of this Court's clear directive that

> "[p]arol evidence under the guise of a claimed latent ambiguity is not permissible to vary, add to or contradict the plainly expressed terms of this writing or to substitute a different contract for it to show an intention or purpose not therein expressed." [*Mich Chandelier*, 297 Mich at 49 (citation omitted).]

Surely, the majority is aware of this limitation on the latent-ambiguity doctrine. It cites *Mich Chandelier*, as does this dissent. Yet the majority has no apparent explanation for its disregard of this limitation and for its resultant misapplication of the doctrine. The majority does not explain why, "'under the guise of a claimed latent ambiguity,'" it permits parol evidence that undeniably "'var[ies], add[s] to or contradict[s] the plainly expressed terms of this writing . . . .'" *Id.* According to the releases' clear language, "all other persons" are released from liability; according to the parol evidence offered by

17

plaintiff, only the Allen Park officers are released. Not only does this evidence contradict a plainly expressed term of the releases, it nullifies the term altogether. In permitting this evidence, the majority abuses the latent-ambiguity doctrine and offends traditional principles of freedom of contract by "'substitut[ing] a different contract'" for the contract to which the parties freely assented. *Id.*

In my view, instead of pursuing its novel latent-ambiguity theory when no such ambiguity exists, the majority would have been better advised to apply what is perhaps the most well-established of all rules of contract law, and one that provides a straightforward resolution of this case: that "'one who signs a contract will not be heard to say, when enforcement is sought, that he did not read it, or that he supposed it was different in its terms.'" *Farm Bureau*, 460 Mich at 567 (citation omitted).[13] Surely the majority is aware of this basic rule of contracts, yet it entirely ignores the rule, one undoubtedly recognized and acted on by all prudent citizens in their own contractual dealings. These citizens, knowing their obligations as responsible adult persons and reading the majority's opinion, must be asking themselves: "But I thought I had to read my contracts before I signed them. Why doesn't the Michigan Supreme Court talk about that rule?" This confusion is understandable because, as the circumstances of this case

---

[13] In fact, the majority's decision arguably places in doubt the viability of *Farm Bureau* and the string of cases dating back well over a century that have espoused this rule. See, e.g., *Komraus Plumbing & Heating, Inc v Cadillac Sands Motel, Inc*, 387 Mich 285, 290; 195 NW2d 865 (1972); *Gardner v Johnson*, 236 Mich 258, 260; 210 NW 295 (1926); *Liska*, 112 Mich at 637-638.

reveal, it is impossible to view the instant dispute at its core as anything other than an instance in which a party claims relief because he has not read his own legal document. Plaintiff is seeking to be excused from his own dereliction of personal responsibility, and the majority accommodates him, to the eventual detriment of all who have taken more care in their responsibilities, all of whom will now be less certain that their contracts will be upheld as intended by the courts of this state.

The releases at issue are not lengthy, complex, or technical. Plaintiff does not claim that he was fraudulently induced into signing them. To the contrary, he was represented by counsel when he knowingly signed the same release *twice*. Under these circumstances, the only logical explanation for his predicament is that plaintiff and his counsel did not read even *the first sentence of their releases* before assenting to their terms. And the procedural history of this case only compounds the carelessness of their error. Plaintiff executed the releases in July, but did not even provide them to the Melvindale defendants until October, at which time it appears that neither he nor his attorney had read even the first sentence of these two-page documents to which he committed himself.

Because the law so clearly does not support the result reached, I can only give the majority the benefit of the doubt and assume that it makes new law in order to accommodate what it views as the sympathetic facts of this case, thus reaffirming the adage that "bad facts make bad law." There is no dispute that the facts of this case are "bad" in the sense that the appellant is more sympathetic than the appellant in *Romska.* The majority takes note of several factors that the trial court relied on to distinguish

19

*Romska*: that the Melvindale officers rejected the case-evaluation awards against them, that a trial date was set, and that the court entered a consent order dismissing the Allen Park officers only.[14] While I find it interesting that the majority feels the need to distinguish a case and overrule it at the same time, I do not disagree that the facts here make this case different from *Romska*, at least to the extent that they evoke some greater sympathy for plaintiff's and counsel's predicaments. However, these facts, while distinguishing in the sense that every case can be distinguished in its facts from another, are *legally irrelevant*, and it is up to courts to recognize what distinctions are and are not legally relevant. While one does not have to be Atticus Finch, attuned to walking in another's shoes, to empathize with plaintiff and his attorney once they finally read their own releases, the majority fails to explain why the specific facts of this case warrant disregard for time-honored principles of contract law.

---

[14] The majority's characterizations of some of the distinguishing aspects of this case are questionable and deserve further comment. First, the majority's statement that plaintiff "expressly preserved [his claim for assault and battery against the Melvindale officers] by rejecting the case-evaluation awards assessed against them" is misleading. Both plaintiff *and* the Melvindale officers rejected the case-evaluation awards. Second, the majority's contention that the Melvindale officers' release from liability was not supported by consideration is simply legally incorrect. There is no requirement that the consideration for an agreement come from a third-party beneficiary of the agreement. As the Court of Appeals explained in this case, "'the basic rule of contract law is that whatever consideration is paid for all of the promises is consideration for each one . . . .'" *Shay*, unpub op at 5, quoting *Hall v Small*, 267 Mich App 330, 334; 705 NW2d 741 (2005). Thus, I disagree with the majority's conclusion that the "Melvindale officers would obtain a complete windfall by being released from liability for their acts" and that this would "be an unjust result . . . ." Such a conclusion improperly suggests that plaintiff's allegations are true, and it is premised on a misconstruction of basic contract law.

20

This Court has applied evenhanded justice to facts that are far more difficult than those presented in this case, one in which no loved one has died and no child has been permanently injured. Michigan courts have regularly applied our contract principles to facts that suggest that the parties may not have intended the meaning expressed in the unambiguous language of a contract. See, e.g., *Mich Chandelier*, 297 Mich at 49 (explaining that the Court might have reached a different conclusion "[i]f we were permitted to glean from the mind of [the defendant] his actual intent"); *Meridian*, 242 Mich App at 650 (refusing to consider an affidavit similar to that offered by plaintiff in this case because of "the clear and unambiguous language of the release"). And this Court has made clear that a "'mistake is not an ambiguity.'" *Mich Chandelier*, 297 Mich at 48 (citation omitted). By steadfastly applying Michigan's fundamental principles of contract law, even to cases involving what the majority may view as "bad facts," this Court has determined over time that stability of contract, the equal rule of law in giving meaning to contracts, and the integrity of the judicial process all predominate over the goal of allowing a careless person who has failed to read his contract to avoid the consequences of his carelessness. There will be subtle, but inevitable, costs to the legal system from the majority's failure to give this same consideration to these values in today's decision.

## III. MAJORITY'S NEW RULE

While there is much that is unclear about the majority's new rule, what *is* clear is that by disregarding well-settled contract principles, this Court has embarked on a new approach in which the parties' intentions as expressed in the vehicle through which such

21

intentions have traditionally been communicated-- the contract itself-- are no longer dispositive.[15]  Indeed, the majority's studied silence in response to this dissent, and with regard to established rules of contract law, suggests that the majority is not much interested in reconciling its decision with rules that have governed the law of contracts in this state for more than a century.[16]  Instead, according to the majority's new rule, a court may now consider extrinsic evidence to determine the scope of a release from liability "when an unnamed party seeks to enforce third-party-beneficiary rights based on the

[15] Contrary to the assertions of the majority, the well-settled and long-established body of Michigan contract law governs this case, not the Third Restatement of Torts.

[16] The majority does not respond to *any* of the criticisms offered in this dissent, concluding summarily that it finds the dissent "unpersuasive, despite its 32 pages in length, because the arguments are repetitive of Justice MARKMAN's analysis in *Romska . . . .*"  However, given that the majority has never before responded to the arguments in *Romska*, it is hard to understand the relevance of its observation that a response on its part would be "repetitive."  In short, the majority has *never* offered any such response.  Thus, all that is truly repetitive here is the majority's failure to explain why the arguments offered in this dissent are neither compelling nor persuasive.

The majority also incorrectly suggests that the only authorities offered in support of this dissent are "Court of Appeals decisions decided *after Romska.*"  These post-*Romska* decisions, of course, are not cited to justify *Romska*, but are  cited to demonstrate the uniformity with which *Romska* has been applied and the resulting reliance on its rule.  The actual authority cited in support of this dissent consists of the various rules of contract developed by this Court for over a century, including such long-established principles of contract law as those asserting that (a) courts do not create ambiguity and instead enforce unambiguous contracts as written, see, e.g., *Smith Trust*, 480 Mich at 24; *Frankenmuth*, 460 Mich at 111; *Juif*, 287 Mich at 40-41; (b) parties are required to read their contracts before they sign them, see, e.g., *Farm Bureau*, 460 Mich at 567; *Komraus Plumbing*, 387 Mich at 290; *Gardner*, 236 Mich at 260; *Liska*, 112 Mich at 637-638; (c) the latent-ambiguity doctrine is limited by the proposition that extrinsic evidence is not permitted to alter a written contract, see *Mich Chandelier*, 297 Mich at 48-49; *Hall*, 295 Mich at 409-410; and (d) freedom of contract is an overriding principle of contract law in Michigan, see, e.g., *Terrien*, 467 Mich at 71; *Rory*, 473 Mich at 469.

broad release language but the evidence presented establishes that an ambiguity exists with respect to the intended scope of the release." I know what this rule does *not* mean-- it no longer means that extrinsic evidence is permitted only to determine the intent of the parties upon a finding of a patent ambiguity or the existence of a latent ambiguity. But ascertaining what it *does* mean is considerably less clear. Thus, increased contract litigation in this state is all but certain.

The first prong of the majority's rule considers whether an "unnamed party seeks to enforce third-party-beneficiary rights based on the broad release language." As a threshold matter, with the very first word of this inquiry, the majority leaves open the possibility that it is adopting a "specific identity rule," which holds that a general release will only discharge those "'specifically named in the release' . . . ." *Romska*, 234 Mich App at 526 (HOEKSTRA, J., concurring in part and dissenting in part), quoting Recent Developments, *Tort law—The general release forms: Three distinct views*, 21 Am J Trial Advoc 445, 446 (1997). Even the Court of Appeals partial dissent in *Romska* rejected this rule, observing that this approach "strays the furthest from the common law rule," and can "create a trap for unwary plaintiffs' attorneys." *Romska*, 234 Mich App at 526, 530 (citations and quotation marks omitted). The majority here is less explicit about its intentions. Its decision does not preclude the requirement that every discharged person and entity be specifically named in a release in order to be within the release's scope, but it also does not acknowledge this. If it is the majority's intention to adopt the "specific identity rule," then it has effectively abolished the use of general releases in this state; if this is not the majority's intention, then by its silence it is ensuring uncertainty and

confusion in a realm of law in which uncertainty and confusion are most damaging to the conduct of personal and business affairs.

The majority opinion also cites favorably the formulation of the rule the *Romska* partial dissent would have adopted:

> [I]n order to determine the intentions of the parties about the scope of a general release, extrinsic evidence should be allowed to determine whether a *stranger* may rely on the omnibus language "all other parties, firms, or corporations" that is contained within a release. [*Id.* at 533 (emphasis added).]

If this is the purpose behind its new rule, the problem is that the "very provision in controversy, and agreed to by the parties to the contract, explicitly relates to the interests of strangers." *Romska*, 234 Mich at 516 n 4 (majority opinion). A person relying on the language "all other persons" in a release *is* necessarily a "stranger," at least in a legal sense, to the extent that he or she is not a named party. Thus, stating that a contract provision providing for the release of "all other persons" is effective with regard to everyone *except* a "stranger" is equivalent to saying that it is not effective at all. *Id.* Since this seems to be the result the majority desires, it could accomplish this in a far more forthright manner by simply holding that the words "all other persons" in a release will no longer be given legal effect in this state. This would, at least, clarify the legal proposition intended by the majority.[17]

---

[17] Additionally, I note that this focus on the stranger/non-stranger status of the person who relies on a release misconceives the legal issue, which "does not concern the rights of strangers, but rather the rights of the *parties* to a contract to achieve agreed-upon ends, including litigative finality." *Romska*, 234 Mich at 516 n 4 (majority opinion). Accordingly, the majority's new rule "gives little credence to the possibility that, by

However, instead of providing a straightforward and comprehensible, albeit wrong, rule, the majority crafts a new rule that is both wrong *and* interjects confusion into contract law in general, specifically obscuring the law governing the rights of third-party beneficiaries. The majority premises its holding on its unnecessarily convoluted determination that "the Melvindale officers qualify as third-party beneficiaries under the applicable statute . . . ." The third-party-beneficiary statute, MCL 600.1405, provides, in relevant part:

> Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee.
>
> (1) A promise shall be construed to have been made for the benefit of a person whenever the promisor of said promise had undertaken to give or to do or refrain from doing something directly to or for said person.

In *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422, 428; 670 NW2d 651 (2003), this Court provided clear guidance for determining third-party-beneficiary status under MCL 600.1405, explaining that a "person is a third-party beneficiary of a contract only when that *contract* establishes that a promisor has undertaken a promise 'directly' to or for that person." (Emphasis added.) *Schmalfeldt* further emphasized that the test for third-party-beneficiary status is objective and, therefore, a court should look no further than the

---

including broad language in the release, the settling parties wanted to avoid the possibility of future legal burdens potentially arising out of lawsuits by plaintiff against third parties." *Id.* at 517.

"'form and meaning' of the contract itself to determine whether a party is an intended third-party beneficiary within the meaning of [MCL 600.1405]." *Id.*

In light of these first principles, I agree with the majority that the Melvindale defendants are third-party beneficiaries of the releases because the releases objectively establish that plaintiff undertook a promise "directly" to them. Specifically, by releasing "all other persons . . . from any and all claims . . . resulting from an incident occurring on September 8, 2004," plaintiff promised to refrain from doing something *directly* to those defendants-- that is, he promised to refrain from pursuing potential claims against them resulting from the specified incident. This determination is not nearly as difficult as the majority makes it. Contrary to the majority's suggestion, our caselaw governing third-party beneficiaries cannot "be read to mean that the important inquiry is the subjective understanding of the contracting parties," even if "taken out of context," something no one involved in this case, save apparently the majority, has ever thought to do. Rather, our caselaw unequivocally establishes an objective test to determine third-party-beneficiary status, and the Melvindale defendants are clearly third-party beneficiaries of the releases under this test.

Even more troubling than the majority's strained determination that the Melvindale defendants *are* in fact third-party beneficiaries is its misunderstanding regarding the *relevance* of this determination to the disposition of this case. The majority deems this determination significant because "[a]lthough . . . the Melvindale Officers are entitled as third-party beneficiaries to seek enforcement of the releases, the releases are subject to the same 'limitations' and 'infirmities' as they would have been if they had

26

been made directly for those officers." I can only speculate about the meaning of the majority's analysis here, and even then arrive only at a logical black hole. It is beyond dispute that a third-party beneficiary effectively stands in the shoes of the original promisee. See MCL 600.1405. Accordingly, the Melvindale officers have the same rights as the original promisees, the Allen Park officers. Since under the majority's rule, the Melvindale officers have *no* rights under the contract, is this because the majority has found that the Allen Park officers' rights are somehow limited or infirm? No one has called the Allen Park officers' rights into question, nor does the majority provide any explanation for why this would be so. The only alternative rationale that could support the majority's analysis is that the Melvindale officers would have no rights under these contracts *even if* the promise were "made directly to" them. MCL 600.1405. This rationale is directly contrary to the statute, which affirmatively grants defendants the "same right to enforce said promise that [they] would have had if the said promise had been made directly to [them]." *Id.*[18]

Fortunately, the law when properly applied does not require these legal convolutions and contortions. The third-party-beneficiary statute is significant in this case because, as third-party beneficiaries of the releases, the Melvindale defendants had

---

[18] Moreover, this rationale also appears inconsistent with the majority's own rule, as far as I can understand it. According to the majority, the "infirmity" in the releases is the claimed latent ambiguity that is created when the phrase "all other persons" is applied to the Melvindale officers. Thus, if the promise had been made directly to them, and if the Melvindale officers had been named in the releases, there would have been no latent ambiguity even by the majority's erroneous standards and thus no infirmity to somehow limit their rights under the contract.

27

the right to *enforce* their terms. MCL 600.1405(1). And once defendants' rights became vested, plaintiff lost the ability to reform the releases without defendants' consent. MCL 600.1405(2)(a).[19] In this case, the Melvindale defendants' rights became vested once they relied on the language "all other persons" and acted on the promise by moving for summary disposition. At that point, the equitable remedy of reformation became unavailable to plaintiff under the principle that a court may not act in equity "to avoid application of a statute," in this case the third-party-beneficiary statute. *Stokes v Millen Roofing Co*, 466 Mich 660, 671-672; 649 NW2d 371 (2002). Thus, the relevance of the Melvindale defendants' third-party-beneficiary status goes to the availability of equitable relief for plaintiff on his "emergency motion for reformation," which, it should be remembered, he filed two months after the Melvindale defendants moved for summary disposition and more than four months after he executed the releases.[20]

---

[19] MCL 600.1405(2)(a) states:

> The rights of a person for whose benefit a promise has been made, as defined in [MCL 600.1405(1)], shall be deemed to have become vested, subject always to such express or implied conditions, limitations, or infirmities of the contract to which the rights of the promisee or the promise are subject, without any act or knowledge on his part, the moment the promise becomes legally binding on the promisor, unless there is some stipulation, agreement or understanding in the contract to the contrary.

See also Anno: Comment Note—*Mutual rescission or release of contract as affecting rights of third-party beneficiary*, 97 ALR2d 1262, 1264, which explains that "where a third-party beneficiary contract has been accepted or acted upon by the third party, it cannot be rescinded by the principal parties without the third party's consent."

[20] In light of this chronology, there are additional reasons why reformation may not have been available to plaintiff, including one derived from the following equitable

28

However, the first prong of the majority's new rule, which considers whether an "unnamed party seeks to enforce third-party-beneficiary rights," suggests that the statute is relevant for a different reason. That is, it appears that under the majority's rule, the fact that an "unnamed" third-party beneficiary is relying on a release somehow transforms the legal effect of the release, rendering ambiguous what would otherwise be unambiguous. I am unaware of any existing rule of interpretation that adopts such a novel approach by which the legal effect of unambiguous language depends on the persons *to whom* such language applies. Quite simply, the confusion the majority introduces into the law governing third-party beneficiaries is inexcusable and unnecessary. The third-party-beneficiary statute is relevant in this case only because it precludes a court from considering plaintiff's motion for reformation, not because it provides a basis for rewriting Michigan contract law.

The second prong of the majority's new rule considers whether "the evidence presented establishes that an ambiguity exists with respect to the intended scope of the release." With this statement, the majority conclusively illustrates its profound misunderstanding regarding contractual ambiguity. Contrary to the majority's assertion here, as a general rule, when a contract is clear and unambiguous on its face, extrinsic evidence is *not* permitted to "establish[] that an ambiguity exists with respect to the intended scope of the release." Such evidence is only permitted in the exceptional case to

maxim: "'Equity will not assist a man whose condition is attributable only to that want of diligence which may be fairly expected from a reasonable person.'" *Powers v Indiana & Mich Electric Co*, 252 Mich 585, 588; 233 NW 424 (1930) (citation omitted).

prove the existence of a *latent* ambiguity, and a latent ambiguity is found to exist only when the "'circumstances to which the words of the instrument refer [are] susceptible of explanation by a mere development of extraneous facts *without altering or adding to the written language . . . .*'" *Hall*, 295 Mich at 409 (citation omitted; emphasis added.). That is, a "'claimed latent ambiguity is not permissible to vary, add to or contradict the plainly expressed terms of th[e] writing . . . .'" *Mich Chandelier*, 297 Mich at 48. The majority has it exactly backwards by allowing extrinsic evidence to be presented to "*establish*[] that *an ambiguity* [apparently patent or latent] exists . . . ." (Emphasis added.) Thus, in its holding today, the majority uses the latent-ambiguity doctrine's exception, which permits extrinsic evidence to discern intent *before* an ambiguity has been found to exist, to rewrite the fundamental rule of contracts that when a contact is clear and unambiguous on its face, a court will not consider extrinsic evidence and will enforce the contract as written. See, e.g., *Farm Bureau,* 460 Mich at 566. The majority does not even acknowledge this remarkable break with more than 150 years of contract law in this state.

Tragically, the impact of the majority's new rule will be felt by the millions of citizens of this state who rely on the promises of contracts, and the good faith of those who enter into such contracts, to structure their personal and business affairs. There is simply no principled reason in the law why the majority's new rule should not be extended to contact law in general. Although the majority might consider its ruling as a narrow one that is limited to "unnamed" third-party beneficiaries of a contract, there is not one rule of contract law in Michigan that applies to disputes between parties and another rule that applies to disputes involving third parties, at least before today. Indeed,

MCL 600.1405 makes clear that a third party has the same right to enforce a promise that he would have had if the promise had been made directly to him. Moreover, there is no principled reason for limiting the majority's new rule to releases only, as opposed to contracts generally. As the majority itself recognizes, this Court has always applied the same theories of contract law to disputes regarding a release. See *Denton v Utley*, 350 Mich 332, 335-338; 86 NW2d 537 (1957). As in any other contract, "'[t]he validity of a release turns on the intent of the parties,'" and "'[i]f the language of a release is clear and unambiguous, the intent of the parties is ascertained from the plain and ordinary meaning of the language.'" *Batshon v Mar-Que Gen Contractors, Inc*, 463 Mich 646, 650; 624 NW2d 903 (2001) (citation omitted). Finally, citizens should not take false hope that the majority will limit its ruling because, unfortunately, the instant decision is consistent with the actions of this Court as of late in the realm of contract law.[21] In my view, it is self-evident that the rule of law demands that contracts be respected and that this Court provides the leadership and legal direction to ensure that this occurs. Unfortunately, I am not convinced that my colleagues in the majority share this view. Therefore, although I wish I could believe that the majority's new rule will not apply broadly to contracts in general, I see no rational reason why this would be so. Doubtless, after years of unnecessary litigation, we will learn whether this is the case or not.

---

[21] See, e.g., *Genesee Foods Servs, Inc v Meadowbrook, Inc*, 483 Mich 907 (2009).

## IV. CONCLUSION

For all these reasons, I would affirm the unanimous judgment of the Court of Appeals, which reversed the trial court and remanded for entry of judgment in favor of the Melvindale defendants. In deciding to the contrary and overruling *Romska v Opper,* the majority's decision recklessly unsettles contract law in this state on the basis of an essentially impenetrable analysis. Because the majority's new "rule" undermines the freedom to contract, and because it ignores the express language of the relevant lawmakers of this contract, the parties themselves, I strongly dissent.

CORRIGAN and YOUNG, JJ., concurred with MARKMAN, J.